HERMANCE (BUCK v.). See Cases Nos. 2,081 and 2,082.

HERMANCE (UNITED STATES v.). See Cases Nos. 15,355 and 15,356.

HERMANN (DELAUNEY v.). See Case No. 3,757.

HERMANN (MAYER v.). See Case No. 9,344.

## Case No. 6,409.

### The HERMINE.

[3 Sawy. 80; [1] 6 Chi. Leg. News, 398.]

District Court, D. Oregon. Aug. 18, 1874.

DESCRIPTION OF VOYAGE — SUIT FOR WAGES AGAINST FOREIGN SHIP — DESERTION — CONTRACTS WITH SEAMEN—QUANTUM MERUIT.

1. Under the merchant shipping act of England of 1873, the shipping articles need only

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

specify the maximum duration of the engagement of a seaman. and the places or parts of the world to which it does not extend: *Held*, that a specification of the places to which the voyage or engagement might extend, was an implied agreement that it was not to extend to any other, and therefore a sufficient compliance with the act.

2. A court of admiralty will not decline jurisdiction of a suit by foreign seamen against a foreign vessel to recover wages, where it appears that the voyage has been completed or broken up, or the seamen have been discharged by the wrongful act of the master.

3. Semble, that the court will not decline jurisdiction where it appears the seamen have been discharged with their own consent before the expiration of the voyage, without the payment of wages already earned, or any agreement or understanding concerning them.

4. A seaman is bound to stay by the vessel according to his agreement, whether the master takes any means to compel him to do so or not, and therefore where seamen leave a vessel before the completion of the voyage, although with the knowledge of the master, and upon his promise that they shall not be arrested therefor, but without his consent, they are guilty of desertion.

5. Contracts with seamen, upon a discharge before completion of voyage, concerning wages already earned, will be set aside or disregarded by courts of admiralty if inequitable.

6. Quantum meruit, what seaman entitled to on.

[Cited in The Topsy, 44 Fed. 636.]

Addison C. Gibbs and Ellis Hughes, for libellants.

William H. Effinger, for claimants.

DEADY, District Judge. Peter Whelan and five others bring this suit against the British bark Hermine to recover the sum of $489.98 alleged to be due them as wages for services as seamen on said bark, on a voyage from Liverpool to this port.

The libellants shipped on the Hermine at Liverpool on January 21, 1874, as ordinary seamen, "on a voyage from Liverpool to Portland (Oregon), and any ports and places in the Pacific, Indian and Atlantic oceans, China and Eastern seas; thence to a port for orders and the continent of Europe (if required), and back to a final port of discharge in the United Kingdom: term not to exceed three years;" at the monthly wages of 3 pounds 5 shillings.

It is alleged in the libel, that the libellants, during the voyage, were "fed upon very poor food, of such poor quality as to endanger their health and render them liable to scurvy and other sickness," and that therefore they asked for their discharge at this port, "unless they could be better treated and fed," and that thereupon the master discharged them, but refused to pay them their wages.

The answer of the claimants, G. H. Fletcher & Co., of Liverpool, denies that the libellants were poorly fed or otherwise improperly treated on the voyage, or that they left the vessel on that account, or that the master discharged them, and avers that the libellants deserted the vessel and thereby forfeited their wages.

The Hermine arrived at this port on August 5, and a few days afterwards the libellants asked the master—Alfred H. Hiscock—for their discharge. He replied that he was willing to discharge them if they would forfeit the wages earned, as he would have to pay double or more wages for seamen in this port, to take their place. Roberts wanted $15 but finally agreed to take $5. Rogers agreed to the same terms; and the others said they would forfeit their wages if the master would give them a legal discharge.

On the following day, Monday, August 10, the libellants, by the direction of the master, met him at the British consul's office. The matter was then stated to the consul, who declined to discharge the men unless they were paid in full. This the master declined to do, and the consul directed the men to return on board. Some conversation then ensued between the master and the men, the latter being still anxious to leave the vessel, the result of which was, that the former promised if the libellants left, he would not arrest them. Thereupon the libellants returned to the vessel, and after some hours the master followed. The result was that the master paid the men from $3 to $4 apiece, except Roberts, to whom he paid $8, when they took their effects and quietly went ashore on the same day. In addition to these sums they had each received a month's wages in advance, and $6 from the slop-chest on the voyage.

The master did not expressly assent to the libellants' quitting the ship, but he had good reason to believe they would do so, and took no means to prevent it. In fact, the money paid libellants was given to and received by them with the tacit understanding that if they were allowed to clear out without being troubled or arrested, they would make no further claim against the vessel.

The libellants had no cause to complain of their treatment on the voyage. On the trial they testified that the beef and bread were bad, but the weight of evidence is that both were as good as is usually furnished at the port of Liverpool. They were otherwise very well supplied and cared for, and were in good health during the whole of the long voyage. Neither did they complain of bad food or ill treatment of any kind to the British consul, although they had ample opportunity to do so, if they desired; nor did they leave the vessel on that account, but so far as appears, for the purpose of bettering their condition in a pecuniary point of view. The wages out of this port average $40 per month—more than twice the rate at which they were engaged to serve on board the Hermine for the next two and a half years.

It is admitted that the answer correctly describes the voyage set out in the shipping articles, but the libellants maintain that the

description of the voyage beyond this port is so vague and uncertain as to render the contract so far void, and therefore the libellants are entitled to their discharge and wages here as being the legal end of the voyage.

The contract having been made in a British port for service on a British vessel, its validity must depend upon the law of that country. This is the general rule of law, and it is particularly applicable to cases like this in the admiralty courts, which "are in some sense international courts charged with the duty of declaring the law applicable to ships." The Acme [Case No. 27]; The Jerusalem [Id. 7,293]; The Infanta [Id. 7,030].

Section 149 of the English merchant shipping act, 1854, provides that the shipping articles shall, among other things, contain the following: "The nature and, as far as practicable, the duration of the intended voyage or engagement."

The merchant shipping act, 1873, amends this section, so that the agreement, "instead of stating the nature and duration of the intended voyage or engagement," may "state the maximum period of the voyage or engagement, and the places or parts of the world (if any) to which the voyage or engagement is not to extend."

No English authorities have been cited upon the construction of this provision, but I think that under the act of 1873, if not the one of 1854, the description of the voyage is sufficient. The maximum duration of the engagement is fixed at three years, and although the articles do not expressly "state the places, or parts of the world" to which it is not to extend, I think they do so sufficiently when they mention "the places, etc.," to which it may extend. By a necessary implication all other "places or parts of the world" than those mentioned are excluded from the engagement—it does not extend to them.

Upon this point counsel for libellants cite Snow v. Wope [Case No. 13,149], in which the agreement was held void, because the articles only described the voyage as being "from the port of Boston to Valparaiso, and other ports in the Pacific ocean, at and from thence home, direct, or via ports in the East Indies or Europe," without any limitation upon the time to be occupied in making such voyage. The court held that the agreement was void because it did not comply with the act which required that the agreement should declare "the voyage or voyages, term or terms of time," for which the seamen may have shipped. But in the case at bar, the duration of the engagement is limited, and it is to be inferred from the opinion of the court in Snow v. Wope [supra], that if there had been a like limitation in that case the court would have held the agreement valid notwithstanding no definite or specific voyage was described in it.

On the part of the claimant it is objected that this being a suit for wages earned by foreign seamen on board a foreign vessel, the court ought to decline the jurisdiction and remit the libellants to the tribunals of their own country. Upon this point counsel cites The Napoleon [Case No. 10,015]; Graham v. Hoskins [Id. 5,669]; Davis v. Leslie [Id. 3,639]; The Infanta [supra]; Bucker v. Klorkgeter [Id. 2,083].

The rule established by these cases is to the effect that the court will not take jurisdiction in such cases unless it is necessary to prevent a failure of justice, as where the voyage has been completed or abandoned, or the seamen discharged, or the contract otherwise dissolved by the wrongful act of the owner or master.

These cases were all decided in the same court, and they carry the rule against the jurisdiction to the extreme. In considering this question, in Ben. Adm. § 282, it is said that "nothing within the territory of a nation is without the jurisdiction. * * * In the present state of international intercourse and commerce, all persons, in time of peace, have the right to resort to the tribunals of the nation where they may happen to be, for the protection of their rights. The jurisdiction of the courts over them is complete, except when it is excluded by treaty." In The Jerusalem [Case No. 7,293], Mr. Justice Story states the rule as follows: "Where the voyage has not terminated, or the seamen have bound themselves to abide by the decisions of the tribunals of their own country, foreign courts have declined any interference, and remitted the parties to their own tribunals for redress. But where the contract has been dissolved by the regular termination of the voyage, or by the wrongful act of the other party, the cases are not unfrequent in which foreign courts have sustained the claim for mariner's wages."

In any view of the matter, this appears to be a proper case for exercising the jurisdiction. The libellants allege that they were discharged by the master in this port without the payment of wages. If the libel be true the voyage is terminated as to them by the wrongful act of the master. Under such circumstances it would be mere mockery and a denial of justice to remit the libellants to the forums of Great Britain, for, being discharged in this port, they are practically denied the means of access to such forums. Indeed, I think the court ought not to decline the jurisdiction, even if it appeared that the libellants were discharged with their own consent without the payment of wages or any agreement or understanding upon the subject, or upon terms that are manifestly inequitable and unjust. In such case they ought to recover as upon a quantum meruit. Being separated from the vessel with the consent of the master, if they are not allowed to enforce any claim which they may have

against her, in this court, it is a practical denial of justice.

But upon the facts of the case the libellants appear to have been guilty of desertion. They cannot complain that the master was aware of their intention to quit the ship and took no means to prevent it or to compel their return after they had left. That is a matter between him and his owners. He may have had good reason to believe, as he stated in his testimony, that they would leave the ship in spite of him, and that it was no use to try to prevent it. That they shipped with the intention of making their way to this coast and then deserting the vessel.

However this may be, the libellants were bound by their contract with the owners to stay by the ship until the completion of the voyage, unless they were actually discharged by the master, or so mistreated as to justify their leaving without his consent. They had no right to leave the ship simply because they could do so, or because the master assured them that he would not trouble them for it if they did. Even if it could be said that the master connived at their quitting the ship, their act was none the less desertion. In so doing they willfully violated their contract with the owners, and they cannot now evade responsibility therefor, by showing that the master was aware of their intention, and took no means to prevent it.

Of course, the master is the agent of the owners, and if it appears that by any artifice or representation he had induced the libellants to quit the vessel under an impression that they had a right to do so, the case would be altered.

But I do not think there is any ground for supposing that the master desired to get rid of these men without paying them their wages. No motive is shown for any such conduct, and so far as appears, the vessel can gain nothing by their leaving, even without their pay. But with the libellants the case is otherwise. They evidently acted upon the fact that they could command more than double the wages, in or out of this port, they were receiving on the Hermine. The pretense that the food was substantially bad, or that they were otherwise ill-treated, is evidently an after-thought. If the food was bad they could and should have complained to their consul, especially when they were before him on this very subject of being discharged.

But supposing it to be true that the libellants not only left the vessel with the knowledge of the master, but also with his consent, still I do not think they are entitled to recover.

In the first place, upon this theory of the case all the circumstances attending the payments made them before leaving, go to prove that such payments were made and received in satisfaction of any claim the libellants might have against the ship for their services. It was competent for them to agree with the master to quit the vessel, and receive so much for their services. True, a court of admiralty, in the interest of the seamen, will look into such contracts and dealings, and if any substantial advantage has been taken of them, so far disregard them, and do justice in the premises.

In the second place, if the libellants were discharged without any understanding or agreement as to the payment of wages, then they ought to recover such sum, if any, as under all the circumstances they are equitably entitled to—as upon a quantum meruit. Under the circumstances what are their services worth to the vessel? Allowing the monthly rate of wages mentioned in the articles, according to the libel there is due the libellants about eighty-one dollars apiece at this port. To supply their places from here to Liverpool, allowing four months for the voyage, at forty dollars per month, will cost one hundred and sixty dollars per man. The difference between that and the price the libellants agreed to perform the same services for is ninety dollars per man—more than the sum claimed by the libellants. It follows that the libellants, having failed to perform their contract, are not equitably entitled to anything, because all the circumstances considered, their services are not worth so much to the vessel as they have received for them.

And this is so upon the supposition most favorable to the libellants—that the Hermine will return to Liverpool direct; for, by the terms of their contract, they might be required to serve two and a half years before being discharged, and to supply their places during all this time at the enhanced wages of this port, or the other seas mentioned in the articles, would add very much to the loss sustained by the vessel.

Let the libel be dismissed, and a decree entered for the claimants for costs.